In the

# United States Court of Appeals
## For the Seventh Circuit

——————

No. 07-1903

CHRISTINA A. ARGYROPOULOS,

*Plaintiff-Appellant,*

*v.*

CITY OF ALTON, AN ILLINOIS MUNICIPAL CORPORATION,
STEVEN DUTY, CHRIS SULLIVAN AND TIM BOTTERBUSH,

*Defendants-Appellees.*

——————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03 C 810—**David R. Herndon**, *Chief Judge.*

——————

ARGUED JANUARY 17, 2008—DECIDED AUGUST 26, 2008

——————

Before RIPPLE, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Christina Argyropoulos's turbulent tenure as a jailor for the City of Alton Police Department (the APD) lasted just ten months, from July 2002 until she was dismissed in late April 2003. Approximately seven weeks before she was fired, Argyropoulos complained that she had been sexually harassed by a fellow

jailor. The APD promptly took steps to prevent further unsupervised contact between the two jailors and began an investigation. Before that investigation ran its course, however, the APD learned that Argyropoulos had surreptitiously tape-recorded a closed-door workplace meeting with two of her superiors, triggering her arrest on a felony eavesdropping charge and her near-immediate dismissal. Contending that she was arrested and fired solely because she complained of sexual harassment, Argyropoulos filed suit against the City and several APD employees, alleging Title VII sexual harassment and retaliation. She later added a claim under 42 U.S.C. § 1983, alleging that the City's failure to provide a pretermination hearing denied her due process. The district court granted summary judgment for the Defendants on all counts and denied Argyropoulos's motion seeking to set aside the judgment. Argyropoulos timely appealed. For the reasons set forth in this opinion, we affirm.

## I. Background

On our review of the district court's grant of summary judgment, we recount the facts in the light most favorable to the nonmoving party, Argyropoulos. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006).

Argyropoulos began work as a jailor for the APD on July 1, 2002. She was hired by Alton's Civil Service Commission, and by virtue of her employment with the City, she was a member of the American Federation of State, County, and Municipal Employees (AFSCME). Argyropoulos was supervised by a rotation of sergeants, at

least one of whom was on duty during her shift on any given day. Those sergeants reported to then-Lieutenant (later Captain) Terry Lane, who had general oversight responsibility for jail operations. Argyropoulos's responsibilities included booking prisoners and performing tasks incidental to the booking process, such as prisoner pat-downs and handling prisoner property.

Argyropoulos received her first formal performance evaluation, which painted a decidedly mixed portrait of her work performance, in late November 2002. The evaluation commended Argyropoulos for her punctuality and positive attitude, and she "met standards" in a number of categories, including: attendance, compliance with rules, safety practices, suspect contacts, work knowledge, work judgments, work quality, accepting responsibility, accepting change, appearance of work area, equipment operation/care, reports, and initiative. In addition, she "exceeded standards" in observance of work hours and accepting direction, and her performance was not deemed "unsatisfactory" in any category. However, the evaluation was not uniformly positive. Argyropoulos "needed some improvement" in a number of areas, including: grooming and dress, employee contacts, planning and organization, job skill level, volume/acceptable work, meeting deadlines, and effectiveness under stress. The evaluation noted Argyropoulos's deficiencies in organizing her duties and working at an acceptable pace during hectic periods—for example, during the simultaneous processing of multiple arrestees—and suggested that she should "strive for speed and organization when completing her work" and become "more attentive to detail."

In her first few months on the job, Argyropoulos worked the same shift as, and received training from, fellow jailor Steven Duty. In light of Argyropoulos's decision not to pursue her sexual harassment claim on appeal, we need not dwell on the historical details of their workplace relationship. For present purposes, it suffices to note that Argyropoulos and Duty had a contentious relationship—featuring complaints from Argyropoulos to her superiors concerning Duty's job performance and offensive remarks by Duty to Argyropoulos[1]—from the start. In December 2002, Cpt. Lane, who was cognizant of the two jailors' difficulties in getting along, decided to minimize their interactions by placing them on separate shifts. Unfortunately, this preventive measure did not bring their troubles to an end. Argyropoulos and Duty still sometimes crossed paths, perhaps unavoidably, at shift changes. One such encounter occurred in the early evening of March 9, 2003, when Duty arrived to relieve Argyropoulos and begin the night shift.

The March 9 encounter began unremarkably. Pursuant to routine shift change procedure, Argyropoulos began to provide Duty with information concerning prisoners then in custody. The trouble began when, at some point in the conversation, Duty interrupted Argyropoulos and asked something to the effect of, "What's that on your tit?"

---

[1] For example, in August 2002, Duty commented to two coworkers, in Argyropoulos's presence, "I don't know man. You better stick around. She's not going to make it. She's too fucking stupid."

As she looked down, Duty reached out and moved her jacket back, revealing a wet spot on the area of her shirt covering her right breast. Angry and embarrassed, Argyropoulos punched Duty in the arm and explained that she must have spilled something on herself. In response, Duty laughed and made a comment about Argyropoulos "not getting [her] freak on." After the shift change was complete, Argyropoulos left the jail without reporting this incident to anyone.

When Argyropoulos returned to work a few days later, however, she reported the "wet shirt" incident to Sgt. Carla Pruitt, setting in motion a chain of events that eventually gave rise to the present lawsuit. News of the incident quickly reached Chris Sullivan, Chief of the APD. The following day, Argyropoulos was summoned to a meeting with Cpt. Lane and several other APD officials. Lane directed Argyropoulos to provide written documentation of the March 9 incident, as well as any other alleged incidents of harassment involving Duty. Argyropoulos prepared a written memorandum the same day—March 13, 2003—documenting both the March 9 incident and another incident from November 2002 in which Duty had called Argyropoulos a "fucking moron" and suggested that she would be better able to concentrate if she would "find somebody to get [her] freak on with."

Chief Sullivan promptly took steps to address the harassment complaint. First, in order to prevent further unsupervised contact between the two jailors, an escort was assigned to Duty each time that he relieved

Argyropoulos at a shift change. Second, Sullivan began an investigation by questioning Duty's supervisors and other APD employees, including Sergeants Botterbush, Pruitt, Hayes, Brakeville, and Adams. Sullivan also interviewed Duty, who denied Argyropoulos's allegations and informed Sullivan that he disliked Argyropoulos because her slowness and mistakes burdened him with additional work. Finally, Sullivan notified David Miles—the City's Director of Personnel and Executive Director of the City's Civil Service Commission—of the harassment complaint. Miles, in turn, notified the Mayor, indicating his agreement with Sullivan that an investigation was warranted and his intention to allow Sullivan to conduct the investigation.

Meanwhile, Argyropoulos's troubles with Duty continued, albeit outside the workplace. For example, on March 21, she reported that, as she was walking down a public street, a male in a blue pickup truck—whom she believed to be Duty—had driven past and shouted a lewd comment in her direction. Apparently frustrated with such incidents and what she perceived to be a lack of progress in the APD's investigation, Argyropoulos met with an attorney on March 28, 2003, to discuss the possibility of filing a lawsuit.

Shortly thereafter, Argyropoulos's job performance became the subject of considerable criticism. On April 5, Lt. Adams reprimanded Argyropoulos for mistakenly delivering other prisoners' property to a juvenile prisoner when releasing him from custody. Adams noted that each item was clearly marked with the correct prisoner-

owner's name, and advised Argyropoulos to double-check property during the release of prisoners. On April 11, Lt. Hayes sent a memo to Cpt. Lane documenting a list of prisoners that Argyropoulos had failed to finish processing during her shift. And on April 19, Adams sent a memorandum to Lane generally excoriating Argyropoulos's job performance. He noted her deficiencies in fulfilling basic responsibilities, indicating that she failed to properly perform prisoner searches and often failed to complete booking of prisoners who arrived during her shift. Adams indicated that "[w]ithout constant supervision, Jailer Argyropoulos fails to accomplish minimal job tasks," and "[she] cannot handle more than one task at a time." He concluded pessimistically, expressing doubt that more time and/or training would lead to improvement.

Nine days later, on April 28, Argyropoulos was summoned to a meeting with Cpt. Lane and Lt. Adams. Argyropoulos assumed, incorrectly as it turned out, that the meeting was called to address the progress of the sexual harassment investigation. Instead, when Argyropoulos arrived at the "extremely small room" that served as the meeting location, Lane and Adams wished to discuss recent complaints concerning her job performance.[2] At the outset, Argyropoulos was unsettled by Lane's

---

[2] We again note that, for purposes of reviewing the district court's grant of summary judgment, we must construe the facts in Argyropoulos's favor. Therefore, although her version of events is dramatically at odds with that of Lane and Adams, we adopt her version of events as the true version for purposes of this appeal.

apparent agitated state; his face had taken on a "blood red" complexion. The meeting quickly took on a confrontational tone, as Lane repeatedly asked Argyropoulos, raising his voice with each repetition, whether she knew the purpose of the meeting. After initially answering that she did not, Argyropoulos yielded to Lane's persistent incredulity—e.g., "You have *no* idea why you're here?"—by speculating that Lane had called the meeting to discuss the progress of the sexual harassment investigation. Lane reacted angrily to this answer, slamming his hands on the table that separated him from Argyropoulos and directing her to sit down and "shut the goddamn door." Unbeknownst to Lane and Adams, Argyropoulos had concealed a tape recorder in her clothing. At this point in the meeting, because she felt physically threatened[3] and "terrified," Argyropoulos secretly activated the recorder.

The remaining details of the April 28 meeting are not essential for purposes of Argyropoulos's claims on appeal; nevertheless, we briefly summarize the highlights here. Lane asked Argyropoulos about other employees' negative reports concerning her job performance. Argyropoulos took issue with Lane's account of some incidents, and Lane expressed disbelief that she would "defy" his authority. When Lane referred to other

---

[3] In her deposition testimony, Argyropoulos indicated that she felt "very threatened" at this point in the meeting and that she "wasn't sure" that her two superiors were not about to commit an act of physical violence against her.

mistakes by Argyropoulos, she requested specific details concerning those incidents. Lane again reacted angrily, threatening to fire Argyropoulos. The tone of the meeting then softened somewhat, as Lane asked whether Argyropoulos could identify any way in which he could assist her to improve her job performance. She noted her earlier difficulties receiving training from Duty and her more recent difficulty receiving training from another coworker who had been on vacation. Finally, Lane asked Argyropoulos to sign a form stating that: (1) Lane and Adams had discussed Argyropoulos's past and present discipline issues and performance inadequacies with her; and (2) she had been given the opportunity to ask questions and seek clarification regarding any topic. Argyropoulos initially declined to sign due to her discomfort with this rather benign description of the meeting. However, believing that she had no realistic alternative, she eventually relented and signed the form.

Later the same day, Julie Anderson, a counselor with the Alton Community Counseling Program, informed another jailor, Jennifer Penney, that Argyropoulos had secretly recorded the meeting with Lane and Adams.[4] Penney, concerned that the secret recording may have

---

[4] Although Argyropoulos denies that she ever told Anderson that she had recorded the conversation with Lane and Adams—she hypothesizes that Anderson must have removed the tape recorder from her jacket and inspected it when Argyropoulos left her jacket on the back of a chair later that day—it is undisputed that Anderson alerted Penney to Argyropoulos's secret recording activities.

been a criminal act, relayed this information to her supervisor, Sgt. Tim Botterbush. Botterbush then met with Anderson, prepared a general case report, and escorted her to meet with Jason Simmons, a detective in the investigation division. Simmons interviewed Anderson, who provided him with a written statement. The next day, Simmons obtained a search warrant for Argyropolous's residence.

The following day—April 30, 2003—Simmons, accompanied by Chief Sullivan and Lt. Taul, executed the search warrant at Argyropoulos's residence. Argyropoulos was home when the officers arrived, and she initially denied possessing any tape recorder or audiotapes in her residence. After the officers began to search the premises, however, she retrieved a tape recorder, delivered it to the officers, and apologized for lying. At that point, she maintained that she had not recorded any workplace conversations, and she did not disclose the existence of any other recorders or audiotapes. Unsatisfied, the officers continued their search and discovered a second tape recorder with an audiotape inside. Finally, when Argyropoulos learned that the warrant authorized the search of her car, she confessed to Simmons that she had recorded the meeting with Lane and Adams. After Simmons retrieved another audiotape from her car, the officers arrested her. Later that day, Simmons met with a Madison County State's Attorney, who reviewed the facts of the case and authorized the issuance of a criminal information charging Argyropoulos with felony

eavesdropping, in violation of 720 Ill. Comp. Stat. 5/14-2.[5]

Chief Sullivan fired Argyropoulos later the same day. In a letter dated April 30, 2003, Sullivan provided three reasons for her dismissal: (1) poor job performance; (2) her allegedly criminal conduct (eavesdropping) while on duty as an employee of the City; and (3) untruthful statements given to Sullivan and other APD representatives during the search of her residence. Sullivan encouraged Argyropoulos to contact Miles, the City's Personnel Director, to discuss her rights with respect to any accrued vacation or sick days and insurance coverage issues. However, Sullivan did not provide any information concerning post-termination avenues to challenge the City's action.

Although Argyropoulos could have challenged her dismissal by requesting a hearing before the Civil Service Commission or by filing a union grievance, she instead opted for the present lawsuit. She received notice of her right to sue from the EEOC on September 2, 2003, and timely filed her initial complaint on December 1, 2003. That complaint alleged sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42

---

[5] 720 Ill. Comp. Stat. 5/14-2(a)(1)(A) provides, in relevant part, that a person commits eavesdropping when he "[k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation . . . unless he does so . . . with the consent of all of the parties to such conversation." 720 Ill. Comp. Stat. 5/14-4(a) provides that eavesdropping is a felony.

U.S.C. §§ 2000e to 2000e-17, and state law claims for wrongful termination and defamation. Argyropoulos's first amended complaint, filed on May 20, 2004, abandoned the wrongful termination claim and added a claim for denial of due process under 42 U.S.C. § 1983, as well as a state law claim for intentional infliction of emotional distress. After the district court granted in part and denied in part the defendants' motion to dismiss, Argyropoulos filed her second amended complaint on February 15, 2005, pursuing the following claims: (1) Title VII sexual harassment and retaliation claims against the City; (2) § 1983 claims against the City, Sullivan, and Botterbush; and (3) an intentional infliction of emotional distress claim against Duty and Botterbush.

On September 28, 2006, the district court granted the defendants' summary judgment motion and dismissed all of Argyropoulos's claims with prejudice. On March 22, 2007, the court denied Argyropoulos's motion to set aside the judgment, and she timely appealed. On appeal, Argyropoulos has abandoned her sexual harassment and intentional infliction of emotional distress claims; she now challenges the district court's grant of summary judgment only as to her Title VII retaliation and perhaps belatedly, the § 1983 claims, but more about that later. In addition, Argyropoulos appeals the district court's denial of her motion to set aside the judgment. Thus, the scope of our review is confined to those matters.

## II. Discussion

### A. Title VII Retaliation Claim

On appeal, Argyropoulos focuses almost exclusively on her Title VII retaliation claim; the district court granted summary judgment for the City on this claim. Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of the nonmoving party, Argyropoulos. *Timmons*, 469 F.3d at 1125. However, our favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (citation omitted). Thus, we have explained that the nonmoving party "must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). We will conclude that a genuine issue of material fact exists, precluding summary judgment, "only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (citation omitted).

Title VII forbids employer retaliation where an employee "has opposed any practice made an unlawful employment practice" by Title VII or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). The anti-retaliation provision operates to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, or their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

Argyropoulos can prove retaliation under either the direct or indirect method. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method, Argyropoulos must present evidence, direct or circumstantial, showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two. *Id*. Alternatively, Argyropoulos may establish a prima facie case of retaliation under the indirect method by showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; (3) she met her employer's legitimate expectations, i.e., she was performing her job satisfactorily; and (4) she was treated less favorably than some similarly situated employee who did not engage in statutorily protected activity. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007); *see also Burks v. Wis. Dep't of Transp.*, 464 F.3d

744, 759 (7th Cir. 2006) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

The first two elements of proof are the same under either the direct or indirect method, and they are not in dispute. Argyropoulos's sexual harassment complaint clearly constitutes a statutorily protected activity, and her termination qualifies as a materially adverse action. *See Burks*, 464 F.3d at 758 (noting that "termination is certainly an adverse action"). Further, because the prospect of an arrest on a felony charge "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57, the eavesdropping arrest also qualifies as a materially adverse action. Therefore, we need only determine whether Argyropoulos has presented evidence to create a triable issue with respect to the remaining elements under either the direct or indirect method.

Argyropoulos first proceeds under the direct method, which requires her to show a causal connection between her statutorily protected activity and the City's subsequent adverse employment action. *See Burks*, 464 F.3d at 758. Argyropoulos contends that she has direct evidence of such a causal connection, pointing to the City's admission that her surreptitious recording of the meeting with Lane and Adams was one of the primary reasons for her dismissal. "Evidence of retaliation is 'direct' when, if believed, it would prove the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). Because direct evidence "essentially requires an admission by the employer," such

evidence "is rare." *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008) (citing *Mannie*, 394 F.3d at 983). Argyropoulos reasons that, because her aim was to obtain evidence of discrimination, she operated under the protective umbrella of Title VII—i.e., she engaged in statutorily protected activity—when she secretly recorded the meeting with her superiors. Thus, she argues, the City's admission that the recording triggered her arrest and termination is direct evidence of the requisite causal connection.

This argument fails because it rests upon a transparently overbroad view of the scope of the statute's protection. Although Title VII indubitably protects an employee who complains of discrimination, *Burlington N.*, 548 U.S. at 68, the statute does not grant the aggrieved employee a license to engage in dubious self-help tactics or workplace espionage in order to gather evidence of discrimination. As we have previously explained, inappropriate workplace activities are not legitimized by an earlier-filed complaint of discrimination. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior."). Thus, the City's admission that the surreptitious recording was a significant factor in Argyropoulos's dismissal does not amount to direct evidence of retaliation.

Without direct evidence of retaliation, Argyropoulos may nevertheless succeed under the direct method if she can muster circumstantial evidence showing the

requisite causal link between her sexual harassment complaint and her subsequent arrest and dismissal; she attempts to do so by pointing to evidence of suspicious timing. She submits that, because her sexual harassment complaint preceded her arrest and termination by only seven weeks, we should infer—in keeping with our obligation to draw reasonable inferences in her favor—a causal link between the two events. The question is whether such an inference is a reasonable one, notwithstanding our previous admonition that suspicious timing, standing alone, "will 'rarely be sufficient . . . to create a triable issue.' " *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Stone*, 281 F.3d at 644); *see also Burks*, 464 F.3d at 758-59 (explaining that "suspicious timing alone . . . does not support a reasonable inference of retaliation" because the "mere fact that one event preceded another does nothing to prove that the first event caused the second" (citation omitted)).

The approximate seven-week interval between Argyropoulos's sexual harassment complaint and her subsequent arrest/termination does not represent that rare case where suspicious timing, without more, will carry the day. Nor do criticisms of Argyropoulos's job performance that followed her sexual harassment complaint materially strengthen her case. *See Burks*, 464 F.3d at 758-59 (finding that plaintiff's negative performance reviews and termination, both of which came after she complained of discrimination, were insufficient to support inference of causation). First, those negative reports identified performance deficiencies—e.g., failure to book multiple prisoners in a timely fashion—that were con-

sistent with Argyropoulos's first performance evaluation, which preceded her sexual harassment complaint by more than three months. This alone undermines the reasonableness of any inference that Argyropoulos's sexual harassment complaint triggered criticism of her job performance. *Cf. Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 420 (7th Cir. 2004) (noting that timing of employer's discipline of plaintiff was "extremely suspicious" where employer had never criticized his performance during previous five years of employment but began to issue frequent written criticisms within a month of the time that plaintiff complained of discrimination). Moreover, although Argyropoulos asserts that she was "blam[ed] . . . for the mistakes of others," she offers no evidence to substantiate that assertion. Thus, any inference of a causal link between Argyropoulos's discrimination complaint and her subsequent arrest and termination would be based on "speculation or conjecture," *Fischer*, 519 F.3d at 401, and such inferences are beyond the scope of our obligation to the nonmovant. For these reasons, Argyropoulos's retaliation claim fails under the direct method.

Argyropoulos also proceeds via the indirect method, but fares no better. The indirect method requires her to show both (1) that she performed her job satisfactorily and (2) that she was treated less favorably than some similarly situated employee. *Nichols*, 510 F.3d at 785. Because she has not presented sufficient evidence to satisfy either requirement, she cannot make the prima facie case under this method.

First, Argyropoulos has not shown that she was perform-ing her duties satisfactorily at the time of her termination. *See generally Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) (noting that "[t]he proper inquiry mandates looking at [the employee's] job performance through the eyes of her supervisors at the time of her . . . termination"). As already discussed, the consistency between Argyropoulos's November 2002 performance evaluation and the negative reports that followed her April 2003 sexual harassment complaint undermines the reasonable-ness of any inference that the latter reports were not genuine. Moreover, Argyropoulos offers no evidence contesting the substance of those criticisms or otherwise demonstrating that she was performing her job satisfacto-rily. For example, she does not dispute her difficulty in booking multiple prisoners in a timely fashion. Therefore, Argyropoulos has not shown that she was performing her job satisfactorily at the time of her termination.

Even if she had shown satisfactory job performance, Argyropoulos would still not satisfy the indirect method, because she has not identified a similarly situated em-ployee who received more favorable treatment. Her task is particularly onerous because of the centrality of the surreptitious tape-recording to this analysis. The similarly situated inquiry is a flexible, common-sense comparison based on "substantial similarity" rather than a strict "one-to-one mapping between employees," but still requires "enough common features between the individuals to allow [for] a meaningful comparison." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008). A meaningful comparison is one which

serves "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Id.* (citation omitted). In this case, that critical independent variable can be isolated only by identifying an employee who engaged in misconduct similar to Argyropoulos's eavesdropping incident but who nevertheless received more favorable treatment. *See Nichols*, 510 F.3d at 786 (requiring plaintiffs to identify an employee who had engaged in similar misconduct in order to satisfy the similarly situated requirement).

Argyropoulos's attempt to satisfy this requirement is plainly insufficient. She has not identified any other employee who engaged in comparable misconduct. Although she points to another City employee who was fired from a *previous* job for a similar incident involving eavesdropping in the workplace, this is simply irrelevant. Only if the other employee had engaged in similar misconduct *while employed by the City* would this employee possibly serve as a useful comparator. Argyropoulos also points out that Duty's job performance had been criticized, but those criticisms did not identify any misconduct remotely similar to surreptitiously recording one's superiors in the workplace. Absent such evidence, Argyropoulos cannot avail herself of the indirect method to avoid summary judgment.

Finally, even if Argyropoulos had managed to establish the prima facie case, her retaliation claim would still face an insurmountable obstacle, because she cannot show

that the City's proffered justification for her arrest and termination was a pretext for retaliation.[6] The City submits that Argyropoulos was arrested and dismissed largely because of her behavior in the eavesdropping incident. In light of this nonretaliatory explanation, to survive summary judgment, Argyropoulos must "establish that there is an issue of material fact as to whether the [City's] proffered reasons are merely pretext for unlawful discrimination or retaliation." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). Pretext involves more than

---

[6] Although we often discuss the employer's proffer of a nonretaliatory explanation and the corresponding pretext inquiry in terms of the *McDonnell Douglas* burden-shifting framework embodied by the indirect method, *e.g.*, *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004), an employee's failure to cast doubt on an employer's nonretaliatory explanation will also doom a retaliation claim under the direct method. *See Culver*, 416 F.3d at 547 (finding that plaintiff established prima facie case of retaliation under the direct method and proceeding to analyze whether, in light of employer's proffered nonretaliatory explanation, plaintiff had created triable issue of pretext). Therefore, "if a reasonable fact finder would be compelled to believe [the City's] explanation," *id.*, Argyropoulos's claim would necessarily fail under either the direct or indirect method. *See Stone*, 281 F.3d at 643 (explaining that satisfaction of the direct method "should be enough to entitle the plaintiff to a jury trial unless the defendant can produce uncontradicted evidence that he would have fired the plaintiff anyway, in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm").

just faulty reasoning or mistaken judgment on the part of the employer; it is "lie, specifically a phony reason for some action." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (citation omitted). Thus, in assessing a plaintiff's claim that an employer's explanation is pretextual, we do not sit as a "'super personnel review board' that second-guesses an employer's facially legitimate business decisions." *Culver*, 416 F.3d at 547 (citation omitted). Rather, we ask only whether the employer's explanation was "honestly believed." *Culver*, 416 F.3d at 540 ("An employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action." (quoting *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997))). If a reasonable fact finder would be compelled to believe the City's explanation, then the City is entitled to summary judgment. *Culver*, 416 F.3d at 547.

Argyropoulos has failed to cast doubt on the City's explanation for her arrest and termination. First, her arrest and termination occurred almost seven weeks after she had complained of discrimination, but just two days after the City learned that she had secretly recorded the meeting with Lane and Adams. Common sense suggests that the latter event, rather than the former, triggered her termination. Moreover, Argyropoulos was arrested and fired only after evidence of criminal activity had been recovered from her home and she had admitted to lying to police investigators. Again, this evidence lends credence to the City's explanation for its actions. Although Argyropoulos might still cast doubt on the City's explanation through evidence of bad faith on the part of the

investigators or other decision-makers, she has offered no evidence to this end. For example, there is no evidence to suggest that Simmons, who obtained and executed the search warrant, was even aware of Argyropoulos's sexual harassment complaint. Nor is there any evidence to suggest bad faith on the part of the (presumably disinterested) state's attorney who elected to pursue the felony eavesdropping charge against Argyropoulos. Lacking such evidence, Argyropoulos's argument rests on speculation that the City's employees lied to conceal their true motives. Such speculation will not withstand summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (because summary judgment is the "put up or shut up" moment in the lawsuit, a mere "hunch about the defendant's motives" is insufficient to survive at this stage).

Argyropoulos also attempts to show pretext by arguing that her conduct was, in fact, legal under Illinois law. She contends that, because she reasonably believed that she faced a threat of imminent physical harm at the time she began recording the meeting with Lane and Adams, her conduct was not criminal under the Illinois eavesdropping statute. Her argument is based on 720 Ill. Comp. Stat. 5/14-3(i), which exempts from criminality the recording of a conversation without the consent of all the parties thereto, so long as that recording is made

> by . . . a person . . . who is a party to the conversation, under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense

against the person or a member of his or her im-
mediate household, and there is reason to believe
that evidence of the criminal offense may be ob-
tained by the recording.

720 Ill. Comp. Stat. 5/14-3(i). Because the criminality of her
conduct depends on whether she harbored a "reasonable
suspicion" that she faced the threat of imminent physical
harm from Lane and/or Adams, Argyropoulos argues, she
has cast doubt on the City's explanation for her arrest
and termination.

This argument goes to the merits, rather than the hon-
esty, of the City's explanation, and thereby misses the
point of the pretext inquiry. To show pretext,
Argyropoulos needed to show not just that the City
exercised poor judgment, but that it acted in bad faith, i.e.,
dishonestly, when it arrested and fired her. Merely show-
ing that she might have been able to raise a meritorious
defense[7] to the eavesdropping charge is hardly tanta-
mount  to showing bad faith. Argyropoulos does not
dispute that her conduct was subject to prosecution under
the language of 720 Ill. Comp. Stat. 5/14-2(a)(1)(A), which
criminalizes the use of "an eavesdropping device for the
purpose of hearing or recording all or any part of any
conversation . . . [without] the consent of all of the parties

---

[7] Of course, we need not, and do not, express an opinion
regarding the merits of Argyropoulos's defense to the criminal
eavesdropping charge. The record does not disclose the out-
come of the actual criminal proceedings. At oral argument,
Argyropoulos's counsel informed the court that she eventually
pleaded guilty to an unidentified lesser offense.

to such conversation." She argues only that she could have prevailed on the "reasonable suspicion" defense created by 5/14-3(i). Even if we assume that she had a good chance of prevailing on this defense, this scenario remains far removed from the sort of baseless prosecution that might support an inference of bad faith.

In short, to show that the City's explanation was pretexual, Argyropoulos would need something more than a colorable defense to the eavesdropping charge, and she has offered nothing more. Therefore, she has not raised a genuine issue of material fact that the City's explanation was a pretext for retaliation, and the district court properly granted summary judgment for the City.

### B.  Motion to Set Aside Judgment

Argyropoulos also argues that the district court erred in denying her motion seeking to set aside the judgment. In addition, she challenges the denial of two related postjudgment motions seeking to conduct further discovery and several prejudgment motions seeking to compel discovery. Argyropoulos cites no legal authority in support of her argument, but instead simply states that she "should be allowed to proceed with further discovery as justice requires." She explains that this argument is tied to her retaliation claim, and that if the court elects to reverse the district court's grant of summary judgment on that claim, she should be allowed to proceed with limited discovery "in the interests of justice." This argument is perfunctory and undeveloped, and is therefore waived. *See United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006); *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004). Moreover,

we are not inclined to reverse the district court's grant of summary judgment on the retaliation claim; thus, the terms of the request make clear that granting it would be futile.

### C.  "Take Back" Letter and Due Process Claims

A post-argument letter sent to the court by Appellant's counsel presents one last puzzling thing that should be addressed. As previously noted, in her second amended complaint, Argyropoulos asserted, among other things, claims for alleged due process violations in connection with her termination, pursuant to 42 U.S.C. § 1983. The district court granted summary judgment against her on these claims (Count III against the City and Count IV against Duty, Botterbush, and Sullivan). And, of course, an appeal was taken from the adverse judgment. However, a careful examination of the Appellant's briefs on appeal suggests that the due process ruling was not one of the issues being appealed. For example, the Appellant's statement of the issues in her opening brief framed only two issues:

> I. Whether Plaintiff raised a reasonable inference that her written complaint about sexual harassment, among other things, moved the defendants to mistreat her.

> II. Whether, in the interests of justice, the district court should have granted Plaintiff's Motion for Relief from Judgment, Motion for Stay and Limited Discovery, Motion to Supplement, and Motions to Compel Discovery and Disclosures.

The balance of the brief is devoted to arguing the retalia-tion claim, save for what is essentially a passing reference to general procedural due process concepts near the end of the brief.[8] Despite a short section in the Appellees' response brief defending the trial judge's ruling on the due process claims, the Appellant's reply brief made no mention whatsoever of a due process theory.

So, leading up to the oral argument in this case, Argyropoulos had devoted scant attention to the concept of procedural due process. In the same vein, Argyropoulos's attempt to establish *Monell* liability for the City consisted only of conclusory statements, devoid of any

---

[8] For example, in explaining the nature of the asserted due process violation, her opening appellate brief stated, without elaboration, "Procedural Due Process requires, oral or written notice of the charges against her, an explanation of the em-ployer's evidence, and an opportunity to present her side of the story." This cursory statement simply summarizes the black-letter contours of procedural due process; it does not even begin to explain why the process that she received in this case was inadequate. Argyropoulos's brief in opposition to sum-mary judgment before the district court was similarly nebulous on this point; the due-process-deprivation argument spans just one page of that brief and fails to clearly identify the nature of the liberty or property interest allegedly at stake. *See Miyler v. Vill. of E. Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008) (noting that, under Illinois law, absent some statute or ordinance imposing substantive limits on the employer's discretion—e.g., specifying that a class of employees can only be fired for cause—public employees do not ordinarily have property rights in employment which trigger due-process protections).

citation to substantiating evidence in the record. Such skeletal treatment of a claim does not facilitate well-informed judicial decision-making; indeed, it essentially invites the court to disregard the claim at issue. *See Kramer v. Banc of Am. Secs., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) (undeveloped argument constitutes waiver); *Smith*, 388 F.3d at 569. One is left to wonder whether Argyropoulos chose to accept the trial court's decision on the due process claim as she did with respect to the Title VII harassment and Illinois-law intentional infliction of emotional distress theories.

As the above discussion suggests, the inadequate development of Argyroupolos's due process claim points in the direction of waiver. *See Hook*, 471 F.3d at 775 ("[P]erfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." (citation omitted)). And at oral argument, Appellant's counsel seemingly delivered the *coupe de grace* to this claim by announcing his intention to waive it altogether; indeed, he indicated that the due process argument should receive consideration only insomuch as it was "relevant to the retaliation claim."[9] Based on this assurance, the oral

---

[9] At oral argument, the court directly asked Argyropoulos's attorney whether he intended to pursue the § 1983 claim on appeal. He explained that although he believed that he had "technically" appealed this claim, he had probably waived it by failing to make any relevant arguments. When the court sought clarification, Argyropoulos's counsel made clear his

(continued...)

argument focused on the retaliation claim, with no mean-ingful discussion of a due process theory.

However, the day after oral argument, Appellant's counsel sent a letter to the court indicating his intention to "reassert all arguments made in Appellant's Brief" and to "retract any waiver [he] made . . . at oral argument." Although the letter did not cite any authority for such a retraction, the Seventh Circuit Practitioner's Handbook provides that, where counsel reconsiders a position taken or a concession offered at oral argument, he may "send a letter to the panel 'taking back' the concession or restating [his] position on a particular point." *Practitioner's Handbook for Appeals to the United States Court of Appeals for the Seventh Circuit* 97 (2003), *available at* http://www. ca7.uscourts.gov/Rules/handbook.pdf. While this provision may be of use to some litigants, it is of no help to Argyropoulos. First, the letter does not even hint at what concession or position is being retracted. Next, it is devoid of any explanation for the change of any position taken at argument. And of course, such a shifting position deprived this court of a clear explanation, either in her brief or at oral argument, of the Appellant's position on due process. Most importantly, if the post-argument letter was an attempt to reassert due process claims, it amounts to far more than the mere "taking back" of a concession

---

[9] (...continued)
intention to abandon the § 1983 claim, stating, "Your Honor, I'm basically waiving any procedural due process claim by not making those arguments and . . . making the retaliation claim my focus . . . ."

imprudently offered at oral argument; because the due process claims were never adequately developed, either here or below, it is an attempt to revive claims that simply never were. *Cf. United States v. Ross*, 412 F.3d 771, 775 (7th Cir. 2005) (allowing retraction of concession where winning argument was adequately developed in opening brief but expressly abandoned in reply brief); *Lear v. Cowan*, 220 F.3d 825, 828-29 (7th Cir. 2000) (argument raised for the first time at oral argument, by the judges no less, was "thoroughly waived"). A take-back letter following oral argument in this case simply cannot resuscitate claims that were never alive in the first place. This court should not have to divine arguments from such a scant record, nor should it have to consider claims which are specifically disavowed when an opportunity to argue them is presented.

A quick look at the merits suggests that Argyropoulos gave up very little, if anything by waiving her wispy due process claims. She completely failed at the trial court to establish a basis for liability as to defendants Botterbush and the City. (Duty wasn't even named in the due process counts of the second amended complaint.) Summary judgment was properly granted for Botterbush, because Argyropoulos failed to identify any evidence in the record showing that he played a role in her termination. And she also failed to support her claim for municipal liability. She asserted, in conclusory fashion, that she was deprived of due process pursuant to municipal policy because "Chief Sullivan was the relevant policymaker," but she failed to identify any evidence in the record substantiating this assertion. The authority, under state or local law, to *set*

policy—i.e., to "adopt rules for the conduct of govern-ment"—distinguishes a "final policymaker," whose decisions may subject a municipality to § 1983 liability, from an official who merely possesses "authority to *implement* pre-existing rules." *Killinger v. Johnson*, 389 F.3d 765, 771-72 (7th Cir. 2004) (emphasis added) (citation omitted); *see also McGreal v. Ostrov*, 368 F.3d 657, 685-86 (7th Cir. 2004). The chief of a police department, even when making internal personnel decisions, does not always possess the requisite policymaking authority. *See Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992) (police superintendent did not act as final policymaker in making allegedly racially and politically discriminatory personnel decisions where municipal ordinances unequiv-ocally banned racial and political discrimination); s*ee also Abbot v. Vill. of Winthrop Harbor*, 205 F.3d 976, 982 (7th Cir. 2000). Thus, Argyropoulos needed to establish, by refer-ence to applicable state or local law, that Sullivan was the final policymaker with respect to police department employment decisions; she failed to provide evidence to this effect, and it is not the court's task to do so on her behalf. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument.").

The termination of the due process claim against Sullivan in his individual capacity is a closer call. The district court reasoned that the police department needed to act quickly to remove Argyropoulos from active duty and found that, under the circumstances, her post-termination opportunities to challenge her dismissal were adequate. The district court relied on *Gilbert v. Homar*, 520 U.S. 924

(1997), in which the Court stated, "[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Id.* at 930 (citing collected cases). However, that conclusion does not displace the near-categorical guarantee of at least *some* pre-termination process to tenured public employees as discussed in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). But Argyropoulos never cited or discussed either *Gilbert* or *Loudermill*, and because of her waiver, we need not explore this issue further.[10]

To recap, Argyropoulos waived her § 1983 claim by not adequately developing her denial-of-due-process argument. Moreover, even if she had adequately developed this argument in her brief, this claim was unequivocally waived at argument, and was not revived by the post-argument letter.

---

[10] Perhaps even if successful on a due process claim against Sullivan, only a nominal victory would have resulted, thus justifying the waiver. *See Dargis v. Sheahan*, 526 F.3d 981, 989 (7th Cir. 2008) (explaining that, because procedural due process safeguards "are meant to protect persons not from the deprivation, but from the *mistaken* or *unjustified* deprivation of life, liberty, or property," a plaintiff is not entitled to recover damages "where [she] would have suffered the same fate had the required hearing been held" (citation omitted)). Besides, the concept of waiver does not apply only to meritless claims; that Argyropoulos might have had a colorable argument did not relieve her of a litigant's obligation to develop it.

### III. Conclusion

Argyropoulos has not raised a genuine issue of material fact regarding retaliation under either the direct or indirect method of proof. In addition, she has not cast doubt on the City's nonretaliatory explanation for her arrest and termination. Therefore, the district court properly concluded that the City was entitled to summary judgment on her Title VII retaliation claim. In addition, by failing to adequately develop her arguments, Argyropoulos waived both her challenge to the district court's denial of her motion seeking to set aside the judgment and her § 1983 due process claims. Accordingly, the judgment of the district court is AFFIRMED.