In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2266

DAYNA L. SCRUGGS,

*Plaintiff-Appellant,*

*v.*

GARST SEED COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 05 C 67—**Allen Sharp,** *Judge.*

ARGUED JUNE 4, 2008—DECIDED NOVEMBER 20, 2009

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Dayna Scruggs appeals from
the grant of summary judgment in favor of her former
employer, Garst Seed Company, on her claims of retalia-
tion and a hostile work environment. A company-wide
restructuring eliminated her position before she filed
a charge of discrimination, so the company did not
retaliate against her for filing the discrimination charge
when it eliminated her position. In addition, although

she contends the company also retaliated against her when it did not hire her for one of the open positions after the restructuring, Garst hired the person who had previously held the position. The incumbent was experienced in the job, and Scruggs has not created an issue for trial that the hiring decision was pretextual. Finally, the relatively isolated gender-based comments and remarks Scruggs's supervisor directed toward her were not sufficiently severe or pervasive to rise to the level of a hostile work environment. Therefore, we affirm the judgment of the district court.

## I. BACKGROUND

Dayna Scruggs worked at Garst Seed Company's seed breeding research facility in Brookston, Indiana, where she was on the soft wheat breeding team. The two other members of the Brookston soft wheat breeding team were Curtis Beazer, a Wheat Breeder, and Eugene Glover, a Research Assistant. Beazer and Glover both held exempt, salaried positions. Scruggs's position as a Research Technician was a nonexempt, hourly wage position.

Scruggs and Beazer began working together in 1988 or 1989. When Beazer ascended to Wheat Breeder in 1995, he became Scruggs's supervisor. Scruggs maintains that after Beazer became her supervisor in 1995, he repeatedly gave her trouble. The conduct to which she points includes her contention that between 2000 and 2002, Beazer refused to provide her with assistance in dealing with temporary employees, including two occa-

sions when temporary employees reacted negatively after Scruggs terminated their employment. She states that one time, while she was discussing his alleged lack of support, Beazer told her that she was "too dumb to catch on" and that the temporary employees were her own responsibility.

Scruggs also alleges that Beazer took several steps in an attempt to have her quit her job. She claims that he intentionally under-built a new greenhouse facility in 2001, changed the temperature in the greenhouse on several occasions, and performed "crosses" of plants too early. She also says that Beazer instructed Glover to spy on her during 2002 and 2003. Scruggs maintains that Beazer later began checking on her several times a day, and that he also once asked her what it would take for her to leave because he would rather hire a 20-year old to do the field work that he and Scruggs currently had to perform.

Scruggs also pointed to several events in 2003. That year, Scruggs says that Beazer introduced her to other employees as the person in charge of "cookies with sprinkles." Scruggs complained to Beazer's supervisor, David Worrall, about this comment. A short time later, Beazer struck a temporary employee. Scruggs did not witness the incident, but she reported it and also said that Beazer had previously hit her. Scruggs maintains that Beazer retaliated against her for reporting the incident by requiring that she take on additional work responsibilities usually handled by Beazer and Glover, although she reported to Worrall only that she was "overwhelmed" by

the job duties she had been assigned. At another point in 2003, Beazer stated that he hated "pushy, aggressive women" and that Scruggs was such a woman.

Scruggs also asserts that at various points during her employment, Beazer said that she was "made for the back seat of a car," that her parties were "drunken fiascos," that she was not "smart enough," and that she looked like a "UPS driver," a "dyke," and was a "redneck." In March of 2004, Worrall met with Scruggs and Beazer in an effort to straighten out the issues between the two. Scruggs told Worrall that she did not trust Beazer because he was "manufacturing" research data and complained about Beazer's comment that he would like to replace her with a 20-year-old employee. Worrall responded that he thought Scruggs had misunderstood the statement. Scruggs then left the meeting. She says that Beazer followed her down the hallway dancing, whistling, and singing.

Scruggs was not the only person at Garst to have problems with Beazer. Beazer also made comments about Eugene Glover and Brian Rice, male Research Assistants at the Brookston facility. Beazer called Glover "fat" and made fun of Rice's home state. He also made derogatory comments about certain employees' cars, among other things. Scruggs testified in her deposition that Beazer did not get along with "[a]nyone that was marginally intolerant or had an opinion he could not tolerate."

Garst managers and Human Resources Director D.J. Horrigan discussed the Brookston facility in the early part of 2004 and the problems Beazer presented. Horrigan

sent Worrall and two other managers a memorandum summarizing discussions regarding the Brookston site in May 2004. The memorandum contemplated a reorganization where Beazer would be demoted to Assistant Breeder or offered a severance package, Glover's position would be eliminated, and Scruggs would keep her position. The proposal discussed in the memorandum was not carried out.

Instead, in September 2004, Syngenta Seeds, Inc. purchased a majority interest in Garst. Syngenta already owned a wheat research and sales program in soft red winter wheat. Therefore, to eliminate redundancy, the company restructured the soft wheat research operations. It closed a facility in Arkansas and restructured staffing at the other soft wheat research facilities, including Brookston. The company decided it would have three salaried employees at each soft wheat research location: Breeder, Assistant Wheat Breeder, and Research Assistant. The position of Research Technician would be eliminated. That was the role Scruggs held in Brookston.

Worrall traveled to the Brookston facility in November 2004 and informed employees of the restructuring. Scruggs was on medical leave at the time, so she was not present. Worrall says that he called Scruggs at home in November 2004 and left her a message advising her that a restructuring would be occurring. Scruggs, however, asserts that she did not receive such a message and that she did not learn of the restructuring until several months later.

On December 3, 2004, Scruggs filed a discrimination charge with the Equal Employment Opportunity Com-

mission (EEOC) that alleged gender discrimination, a hostile work environment, and retaliation. Also that month, Worrall informed Beazer that he would not be continuing at Brookston, and Barton Fogleman became the new Wheat Breeder at that location.

With Fogleman in place, the company set out to hire persons for the two other soft wheat breeding positions at Brookston. Fogleman, Horrigan, and Worrall interviewed candidates for the Brookston Assistant Breeder and Research Assistant positions. Approximately twenty persons applied for the Assistant Breeder position, including Glover. The company interviewed Glover for the Assistant Breeder role but ultimately selected another candidate, Jennifer Vonderwell. Approximately seventeen people applied for the Research Assistant position, including six who also applied for the Assistant Breeder position. Glover and Scruggs were two of the applicants. Glover, Scruggs, and several others were interviewed in March and April of 2005. The company selected Glover. Fogleman explained that the company chose Glover because of his past experience at Brookston, his experience managing test plots at other locations, and his education. Glover has a Bachelor of Science degree in agronomy and had served as the Research Assistant at the Brookston facility for many years. Scruggs does not have a college degree, and she also did not have the same type or level of experience. In particular, Scruggs did not have experience comparable to Glover's in managing plots outside of Brookston. The Brookston facility manages research plots in Michigan, Ohio, Indiana, and Illinois. Glover had managed these

sites for a number of years, and Fogleman believed that his experience would be very helpful going forward.

After Scruggs did not receive the Research Assistant position, she filed another charge of discrimination with the EEOC on April 28, 2005. She alleged that Garst terminated her employment in retaliation for the EEOC charge she had filed the previous December. The district court granted summary judgment in Garst's favor on Scruggs's claims of retaliation, hostile work environment, and gender discrimination.

## II. ANALYSIS

### A. No Error in Denying Motion to Strike

Before we turn to the merits of the summary judgment decision, we address one preliminary matter. Scruggs contends that the district court erroneously denied her motion to "strike" Garst's summary judgment motion, or, in the alternative, to strike Fogleman's affidavit. We review the district court's decision for an abuse of discretion, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008), and find no error. Scruggs maintained that Garst misled her as to the identity of the person responsible for the Research Assistant hiring decision and concealed Fogleman's identity. As the district court recognized, however, Scruggs clearly knew about Fogleman, as he was one of the persons who interviewed her for the Research Assistant position. Scruggs also discussed Fogleman during her deposition, and Horrigan testified at his deposition the

following day about Fogleman's involvement in the decision to hire Glover instead of Scruggs for the Research Assistant position. So, we find no abuse of discretion in the district court's denial of the motion to strike.

B.  Summary Judgment Proper on Retaliation Claim**s**

Scruggs contests the district court's decision to grant summary judgment in Garst's favor on her retaliation claims. She maintains that Garst retaliated against her for complaining about how she had been treated at the company, and that it did so in two ways: first by eliminating her position, and second by declining to hire her for the Research Assistant position at the Brookston facility that became open after the company's restructuring.

We review the district court's grant of summary judgment de novo, viewing the record and all reasonable inferences drawn from it in the light most favorable to the party opposing the motion. *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletic Dep't*, 510 F.3d 681, 687 (7th Cir. 2007). Summary judgment is appropriate when the materials before the court demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Hobbs v. City of Chicago*, 573 F.3d 454, 460 (7th Cir. 2009).

Title VII forbids an employer from discriminating against an employee who has "opposed any practice"

made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Scruggs can prove retaliation under either the direct or indirect method. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under the direct method, a plaintiff must present evidence that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between them. *Id.* A plaintiff proceeding under the indirect method establishes a prima facie case by establishing the same first two elements, as well as that: (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *Kodl v. Bd. of Ed., School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007).

If the plaintiff succeeds in passing this initial hurdle, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for its action. *Stephens*, 569 F.3d at 787; *Fischer v. Avanade, Inc.*, 519 F.3d 393, 408 (7th Cir. 2008). If the defendant does so, the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proferred reason was pretextual to avoid the entry of summary judgment against it. *Argyropoulos*, 539 F.3d at 736. "[A]n employee's failure to cast doubt on an employer's nonretaliatory explanation" means a claim fails under either the direct or indirect method. *Id.* at 736 n.6.

The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action. *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). Garst gave legitimate non-discriminatory reasons for its actions, namely that Scruggs's position was eliminated as part of a company restructuring and that it selected someone else for a new position because that person was better qualified. So we proceed to the pretext analysis. Pretext includes "more than just faulty reasoning or mistaken judgment on the part of the employer; it is 'lie, specifically a phony reason for some action.'" *Argyropoulos*, 539 F.3d at 736 (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006*)* (stating that pretext is "a deliberate falsehood"). If the employer honestly believed the reason it proffers for its employment decision, the reason was not pretextual. *Argyropoulos*, 539 F.3d at 736.

We begin with Scruggs's claim that Garst retaliated against her by eliminating her position as a Research Technician. According to the company, it eliminated the Research Technician position as part of a company-wide restructuring after Syngenta purchased Garst. We agree with Garst that the evidence in the record does not create an issue for trial as to whether this reason was a pretext for retaliating against her. Significantly, the record reflects that the company made its decision to eliminate Research Technician positions *before* Scruggs filed her first EEOC charge on December 3, 2004. Syngenta

bought a majority interest in Garst in September 2004. It then restructured soft wheat research at locations around the country to make its operations more efficient. The decision to eliminate the Research Technician role was made as part of the restructuring, not out of retaliation against one employee. Although Scruggs maintains that Garst did not make the decision until after she had filed her EEOC charge in December 2004, the evidence in the record reflects that the company made the decision before then and that Worrall visited Brookston in November 2004 to communicate the restructuring decision to Brookston employees. Even if Scruggs did not learn of the decision until later (she maintains she did not receive a voice mail that Worrall says he left for her regarding the restructuring), she was away from the office on an extended medical leave in November 2004. The evidence to which she points does not create an issue for trial. She directs us to certain pages in Beazer's deposition testimony, for example, but they only indicate that when Worrall told Beazer that Beazer had to leave the Brookston facility, Worrall did not say why the company was making the change or whose idea it was. They do not suggest that the company-wide restructuring decision took place after December 2004.

Scruggs also argues that Garst did not hire her for the restructured Research Assistant position because she had filed a discrimination charge with the EEOC. Scruggs filed her first discrimination charge with the EEOC in December 2004, and the company made the decision to select another person for the Research Assistant position on April 25, 2005. Garst maintains that it chose a more

qualified candidate for the Research Assistant position, which is a legitimate explanation. *See Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). The question is whether it is a pretext for retaliation. The Research Assistant position required a Bachelor of Science degree in agronomy or a related field, or an acceptable combination of education and experience, including "at least two years of practical experience in plant breeding and genetics in wheat." Scruggs does not have a college degree and did not have any practical experience in genetics. Glover, the person Garst selected for the position, has a Bachelor of Science degree in agronomy. In addition, he had years of experience relevant to the position. He was the incumbent in the role, having served as the Research Assistant/Specialist at the Brookston facility for many years before the restructuring. He was also the person in charge of test plots at multiple other locations—experience that Fogleman believed would be very valuable to the soft wheat breeding team he would be managing at Brookston. That an internal memorandum in the spring of 2004 discussed the possibility of eliminating Glover's position and keeping the one Scruggs held does not cast doubt on the company's assertion that it selected Glover because he was better qualified to serve as the Research Assistant. When Syngenta purchased Garst, it decided to eliminate the Research Technician position, not the Research Assistant position. It is logical that the company would select the person with experience in the Research Assistant position. Scruggs has not raised a genuine issue of material fact that the company's explana-

tion was a pretext for retaliation. Accordingly, summary judgment was appropriate.

### C. Summary Judgment Proper on Hostile Work Environment Claim

Scruggs also argues that the district court erred when it granted summary judgment to Garst on her claim that she was subjected to a hostile work environment because of her gender. Because a "hostile work environment" is a single unlawful practice under Title VII, a discrimination charge based on a hostile work environment encompasses all the events during that hostile environment so long as the charge is filed within the charging period (here, within 300 days of "the last act said to constitute the discriminatory working condition"). *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-21 (2002). When it considered Scruggs's hostile work environment claim, the district court properly considered Beazer's actions outside the 300-day charging period. But even with that conduct in the mix, summary judgment on the hostile work environment claim was correct.

To survive summary judgment on her hostile work environment claim, Scruggs needed to show the following: (1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009). Scruggs is correct that the unwelcome treat-

ment need not be based on "unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." *Boumehdi v. Plastaq Holdings, Inc.*, 489 F.3d 781, 788 (7th Cir. 2007) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004)); *see also Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). Instead, conduct demonstrating "anti-female animus" can support a hostile work environment claim. *Boumedhdi*, 489 F.3d at 788. In other words, a plaintiff can proceed on a claim when the work environment is hostile because it is "sexist rather than sexual." *Id.*

Even so, summary judgment on this claim was proper. To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment. *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). The environment must be both subjectively and objectively offensive. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). Factors in our assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance. *Id.* Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998).

Here, the gender-based conduct was not objectively severe or pervasive. Viewing the record in the light most favorable to Scruggs, Beazer made occasional inap-

propriate comments, including that Scruggs was "made for the back seat of a car" and looked like a "dyke." On the other hand, his conduct was not physically threatening, as he did not touch her or threaten to touch her (other than allegedly striking her with a clipboard in 1995). He did not make comments suggesting that he was interested in her sexually. Instead, most of Beazer's comments related to Scruggs's work habits or alleged lack of sophistication, which were the kinds of comments he made to both male and female employees. The sporadic comments to which she points do not rise to the level of an objectively hostile work environment under Title VII. *See Adusumilli,* 164 F.3d at 361. Because Scruggs cannot show that the environment was objectively severe or pervasive, summary judgment was appropriate on this claim.

Finally, we note that Scruggs raises as the final issue in the statement of issues in her brief whether the district court properly granted summary judgment on her claim of gender discrimination. She does not address a gender discrimination claim in the argument section of her brief, however. As a result, she has waived this argument. *See Salas v. Wis. Dep't of Corrs.,* 493 F.3d 913, 924 (7th Cir. 2007).

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.