In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3002

JANET HATMAKER,

*Plaintiff-Appellant*,

*v.*

MEMORIAL MEDICAL CENTER,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-3319—**Jeanne E. Scott**, *Judge*.

ARGUED MAY 24, 2010—DECIDED AUGUST 30, 2010

Before EASTERBROOK, *Chief Judge*, and POSNER and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.    Janet Hatmaker, a part-time chaplain employed by Memorial Medical Center, a hospital in Springfield, Illinois, was fired and brought this suit against the hospital, charging a violation of 42 U.S.C. § 2000e-3(a). That is the provision of Title VII that forbids an employer "to discriminate against any individual . . . because he has opposed any practice

made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Hatmaker claims to have been fired because she "participated . . . in an investigation . . . under" Title VII. She also relies on the opposition clause, but places less emphasis on it; we discuss it briefly at the end of this opinion. The district judge granted summary judgment for the hospital.

Oddly, when one considers Hatmaker's emphasis in this court on the participation clause, it went unmentioned in her complaint. The district court refused to allow her to raise it in her response to Memorial's motion for summary judgment, holding the omission to mention the clause in her complaint a waiver. That ruling was mistaken. Although *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), require that a complaint in federal court allege facts sufficient to show that the case is plausible, see, e.g., *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008), they do not undermine the principle that plaintiffs in federal courts are not required to plead legal theories. See *Aaron v. Mahl*, 550 F.3d 659, 665-66 (7th Cir. 2008); *O'Grady v. Village of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002). Even citing the wrong statute needn't be a fatal mistake, provided the error is corrected in response to the defendant's motion for summary judgment and the defendant is not harmed by the delay in correction. *Ryan v. Illinois Dept. of Children & Family Services*, 185 F.3d 751, 764 (7th Cir. 1999). Memorial was not harmed.

When the director of Memorial's chaplain staff (see Memorial Hospital, "Hospital Guide—Pastoral Care," www.memorialmedical.com/Guide/PastoralCare/ (visited Aug. 5, 2010)) took a medical leave of absence, which turned out to be only a short time before she died, the hospital appointed Reverend Greg Stafford acting director. After the director's death, the hospital announced that it was searching for a permanent replacement and that Stafford was a candidate. Forrest Hester, Memorial's Chief Human Resources Officer, who was in charge of the search and would make the appointment, solicited the members of the chaplain staff for their opinion of Stafford. In an email to Hester, Hatmaker expressed concern "about Greg's presentation of himself in public and in representing our department. I have observed him speak on several formal occasions . . . and was disappointed in his remarks and appropriateness. He appeared to be both uncomfortable with himself and inexperienced in that role . . . . If he is chosen to lead our department I would recommend some mentoring in this area." In a follow-up email she expressed "discomfort with Greg in a leadership role." She said "he is trying so much to be a 'good ole boy' and friend that he sacrifices dignity and leadership in exchange for popularity . . . . He seems to major in small talk. In short, he does not strike me as a spiritual statesman."

Stafford was appointed director. Hatmaker was critical that the opening for director had not been posted in "professional publications" before the appointment was made, as Hester had suggested would be done. Apparently some other female members of the chaplain

staff were disappointed with the appointment. Their reservations were reinforced, according to Hatmaker, by Stafford's saying in the presence of female staff members that "I have been divorced twice, I don't do women well" and that "what teamwork was" was illustrated by his being permitted to use the same bathroom as the CEO and a vice president of Memorial even though they were his superiors.

Hatmaker emailed Hester that she "continue[d] to have question marks about Greg's leadership in relationship to women," that other women had expressed "their discomfort" with him, and that his "seeming (perhaps unconscious) diminished view of same age or younger women (he seems to do better with older women) will affect staffing in the [chaplain division]." She also wrote: "On a personal level, in several conversations I have had with him he quickly referenced his 2 divorces and his distrust/discomfort with women; however, his obvious attraction to/fear of women raises many questions for me about whether he has addressed or been addressed by this significant issue in his Clinical Pastoral Education." She expressed concern that he had been certified by the College of Chaplains only provisionally and said: "I can't help but wonder if his lack of self knowledge in regard to women and intimacy/partnership is part of his provisional acceptance into this professional organization." She added: "due to my concern I plan to send copy letters to both Martha Sumner on the Board of Directors and [CEO] Ed Curtis, as well."

Upon receipt of this alarming email, Hester decided to start an investigation; he thought it "important . . . to rule out any kind of hostile work environment issue that might exist because the [email] seemed to me to suggest that that could be the case." He forwarded Hatmaker's email to two employees responsible for investigating complaints of discrimination and also told Stafford that she had complained about him. Stafford denied that he had created a hostile work environment.

Hester wanted Hatmaker to speak to the investigator. She was reluctant. She told Hester that "my desire is for your highly focused oversight of Greg in the future in regard to the issues mentioned. To give it any more time or attention is superfluous." And further that "Greg is on a path of insight that will not only help him professionally but for his own happiness. That is where I would recommend that he have a spiritual director/counselor to help him deal with the issues . . . that I reference." But Hester insisted that she be interviewed by the investigator and she yielded. The investigator reported her as saying in the interview that Stafford "puts down women"—that he was "a Southern Baptist and a 'good ole boy' and therefore has inherent sexist attitudes." She said that in his shoes she would have sought therapy. In a follow-up email to the investigator she said that the fact that a rabbi and a priest had written "raving reviews for Greg as director" was no surprise because "they both come from traditions from which female clergy are excluded." She further expressed concern that no female clerics had been asked

to speak at a memorial service for Stafford's predecessor, a woman who Hatmaker thought would have wanted female clerics to share the podium. She compared this omission to the "recent Don Imus debacle in regard to the Rutger's WOMEN's basketball team" (Imus had called the players on Rutgers' women's basketball team "nappy-headed hos"), when "instead of black female clergy being interviewed or asked to speak to the issue, Al Sharpton and Jesse Jackson were the chosen male spokespeople."

Hester and the investigator concluded that Stafford had not created a hostile work environment in the chaplain division and Hester was disturbed by Hatmaker's gratuitous references to Jews, Catholics, Southern Baptists, Don Imus, Al Sharpton, and Jesse Jackson. He instructed the investigator to inform her that "if you are uncomfortable working for Greg and for the department under Greg's leadership you should resign" and that she was "to have no discussions with other employees regarding their perception or problems with Greg." She responded by emailing Hester and the investigator that she would "direct further concerns and/or communications to Greg directly with the hope that he will seek professional guidance." The email went on and on, indicating her preoccupation with Stafford. Hester suspended her for 30 days to give her a chance to express willingness to put her feelings about Stafford behind her. When nothing happened by the end of that period he fired her, telling her it was necessary "for the comfort of all concerned."

Her communications to Hester and to the investigator constituted participation in a purely internal investigation of possible sex discrimination, and even if an internal investigation is an "investigation" within the meaning of the provision of Title VII quoted at the outset of this opinion (a question to which we'll return) she was not fired for participating in it. She was fired because of comments she made that demonstrated bad judgment and a preoccupation with superficial characteristics of her new boss, and for harping on irrelevant sensitive issues of religion and race.

An employer is forbidden to discriminate against an employee who participates in an investigation of employment discrimination. But participation doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination. *Scruggs v. Garst Seed*, 587 F.3d 832, 838 (7th Cir. 2009); *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 553-54 (2d Cir. 2010); *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577-78 (D.C. Cir. 2010). This includes making frivolous accusations, or accusations grounded in prejudice. For it "cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment. To do so would leave employers with no ability to fire employees for defaming other employees or the employer through their complaint when the allegations are without any basis in fact." *Gilooly v. Missouri Dept. of Health & Senior Services*, 421 F.3d 734, 740 (8th Cir. 2005). As further explained in *Mattson v. Caterpillar, Inc.*, 359

F.3d 885, 890-91 (7th Cir. 2004), "Title VII was not designed to 'arm employees with a tactical coercive weapon' under which employees can make baseless claims simply to 'advance their own retaliatory motives and strategies.' . . . Were we to adopt a different standard, an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint with a government agency. Similarly, an employee could assure himself unlimited tenure by filing continuous complaints with the government agency if he fears that his employer will discover his duplicitous behavior at the workplace. This is not an unrealistic parade of horribles—it is, after all, what may have occurred in this case. Mattson filed an internal complaint that was baseless. Had Caterpillar immediately discovered the evidence that proved Mattson acted maliciously, both parties agree that Mattson could have been discharged at that time. However, Mattson then filed the charge with the IDHR and EEOC and now argues that he cannot be terminated even though Caterpillar discovered that both charges were filed maliciously. If we were to adopt Mattson's arguments, it would encourage the abuse of Title VII and the proceedings that it established."

Some courts disagree. They think that even defamatory and malicious accusations made in the course of an EEOC investigation cannot be a lawful ground for discipline. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1007 (5th Cir. 1969); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989); *Womack v. Munson*, 619 F.2d 1292, 1298 (8th Cir. 1980) (but in so

holding, *Womack* is inconsistent with the Eighth Circuit's later decision in *Gilooly*). To these courts "participated in any manner" in an investigation seems to mean "participated by any and all means" rather than participated in any *capacity*, whether formally or informally, whether as complainant or as a witness, and at whatever stage of the investigation. But these courts can't believe that forging documents and coercing witnesses to give false testimony are protected conduct. And if they don't believe that, why do they think that lying is protected? Lying in an internal investigation is disruptive of workplace discipline and in tension with the requirement that opposition to an unlawful practice (the making of which is protected by the first clause of section 2000e-3, see *Crawford v. Metropolitan Govt. of Nashville & Davidson County*, 129 S. Ct. 846, 850-51 (2009)) be based on an honest and reasonable belief that the employer may be violating Title VII. *Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 771 (7th Cir. 2008); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752-53 (7th Cir. 2002); *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

Even *Pettway*, the leading case holding that a participant can't be fired for misconduct in the course of an investigation, shrinks from embracing the full implications of its holding by confining it to cases in which the participant makes accusations that shorn of their malicious and defamatory elements state a claim of discrimination. 411 F.2d at 1007; see also *Womack v. Munson, supra*, 619 F.2d at 1298 n. 10. That condition is not satisfied in this case. It is not a case in which the complaint has a

valid core and there is merely an unsavory wrapping. None of the statements that Hatmaker made to the investigator and Hester, such as her complaints about Stafford's reference to his divorces or to the fact that his boss lets him use the boss's bathroom, was suggestive of sex discrimination, and so they didn't begin to trigger the retaliation provisions of Title VII. They were complaints about an awkward boss who the plaintiff thought might become a problem in the future. Her emails do not accuse him of discrimination and her deposition states that she was just trying to head off the possible future emergence of a hostile work environment. When she said that Stafford was "a Southern Baptist and a 'good ole boy' and *therefore* has *inherent* sexist attitudes" (emphasis added), she was trafficking in stereotypes by attributing "sexist attitudes" to assumed tenets of his religion or to attitudes of his coreligionists. If he shared such attitudes—buried deep and visible only to the penetrating gaze of Janet Hatmaker—there is no evidence that he ever expressed or acted on them.

There is, moreover, an independent ground on which the district court must be affirmed. The "investigation" to which section 2000e-3 refers does not include an investigation by the employer, as distinct from one by an official body authorized to enforce Title VII. (A possible exception, discussed below, is irrelevant to this case.) The participation clause prohibits retaliation against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. A purely internal investigation does not involve a "charge," or testimony,

and neither is it a "proceeding" or a "hearing." To bring an internal investigation within the scope of the clause we would have to rewrite the statute. We therefore join the courts that interpret the participation clause as being limited to official investigations. *EEOC v. Total System Services, Inc.,* 221 F.3d 1171, 1174 (11th Cir. 2000); *Brower v. Runyon,* 178 F.3d 1002, 1006 (8th Cir. 1999); *Vasconcelos v. Meese,* 907 F.2d 111, 113 (9th Cir. 1990); contra, *Hashimoto v. Dalton*, 118 F.3d 671, 679-80 (9th Cir. 1997). We take no position on whether participation in an internal investigation begun *after* a charge is filed with the EEOC should be treated as participation in the official investigation, on the theory, embraced by some courts, that any fruits of the participant's activity are bound to feed into that investigation. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). As stated in *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999), "an employer receiving a form notice of charge of discrimination knows that any evidence it gathers after that point and submits to the EEOC will be considered by the EEOC as part of the EEOC investigation. Though this is an indirect means of gathering evidence to investigate a charge of discrimination, the EEOC considers employer-submitted evidence on an equal footing with any evidence it gathers from other sources. Because the information the employer gathers as part of its investigation in response to the notice of charge of discrimination will be utilized by the EEOC, it follows that an employee who participates in the employer's process of gathering such information is participating, in some manner, in the EEOC's investigation." That is not this case.

It's not even clear that employees would benefit from the broadening of the statute urged by Hatmaker. It might discourage internal investigations in cases such as this, in which a nonfrivolous charge was unlikely to emerge from nebulous suspicions voiced by a busy-body. (In retrospect the employer might well have been spared this suit by taking Hatmaker's advice not to investigate Stafford's conduct.) Such forbearance would burden the EEOC and the courts with employment disputes that could have been resolved amicably by an informal investigation by the employer. There would also be formidable definitional difficulties. Would *any* response, however perfunctory, to Hatmaker's emails have constituted an investigation? And what would count as "participation" in an informal internal investigation? Were the other women on the chaplain's staff whose concerns Hatmaker relayed to Hester also participants in the investigation?

This is not a road we want to go down; more to the point, Congress has not built such a road.

Hatmaker's opposition claim, to which we now turn, falls along with her participation claim. Even when there is no investigation within the meaning of the statute, an employer is, as we know, forbidden to retaliate against an employee for opposing unlawful conduct. But remember that opposition, to be protected by the statute, must be based on a good-faith (that is, honest) and reasonable belief that it is opposition to a statutory violation. It would have been unreasonable for Hatmaker to entertain such a belief, and in any event

she says that, as in *Mattson v. Caterpillar, Inc.*, *supra*, 359 F.3d at 889, she did not.

Affirmed.