In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3788

RYAN LORD,

*Plaintiff-Appellant,*

*v.*

HIGH VOLTAGE SOFTWARE, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 4469 — **James B. Zagel**, *Judge.*

ARGUED JANUARY 19, 2016 — DECIDED OCTOBER 5, 2016

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Ryan Lord claims that he was sexually harassed by male coworkers at High Voltage Software, Inc., and that High Voltage fired him for complaining about it. High Voltage responds that the conduct Lord complained about wasn't sexual harassment and that it fired Lord for other reasons: failing to properly report his concerns, excessive preoccupation with his coworkers' performance, and insubordination. The district court concluded that Lord's

claims under Title VII for hostile work environment and retaliation failed as a matter of law. The judge accordingly entered summary judgment for High Voltage. We affirm. Lord has not shown that he was harassed because of his sex, nor has he called into doubt the sincerity of his employer's justifications for firing him.

## I. Background

High Voltage develops software for video games. In September 2006 the company hired Lord as an associate producer and initially assigned him to its Omni team, a working group named after a game then under development. Lord claims that in January 2007 his male team members began teasing him about his supposed interest in a female audio engineer. His coworkers would comment that Lord had "the audio bug" or ask if he had "[taken] care of the audio bug" whenever the female engineer was in the vicinity. According to Lord, the phrase "audio bug" had sexual connotations that referred to his rumored interest in his female coworker.

Lord first formally complained about the audio-bug joke in a June 5, 2007 email to Human Resources Director Maggie Bohlen. Bohlen initiated an investigation and then met with Lord ten days later to discuss the results. She explained that the audio-bug joke did not amount to sexual harassment but directed Lord to report any further incidents of harassment to human resources "immediately."

Following Lord's meeting with Bohlen, the company's president, John Kopecky, reassigned Lord to a different development team to avoid further "team dynamic issues." Lord also met with Kopecky and Executive Producer Chad Kent for a regular performance review. During that meeting,

Kopecky and Kent addressed Lord's recent complaints about harassment. They explained that High Voltage is a creative workplace where "humor is a common method of communication." But they also said that if Lord felt someone's comments crossed the line, he should ask that person to stop and notify Kent immediately if the comments persisted.

Lord's new working group was known as the Responder team, and Lord began sharing an office with Nick Reimer, another associate producer and fellow Responder team member. Lord claims that between July 18 and July 27, Reimer initiated unwanted physical contact on four separate occasions. First, on July 18 Reimer poked Lord in the buttocks as Lord was bending over to put coins into a vending machine. Next, on July 23 while Lord was talking with another coworker, Reimer slapped Lord's buttocks as he walked past. Two days later Reimer again slapped Lord's buttocks while Lord was purchasing something from the vending machine. Finally, on July 27 Reimer grabbed Lord between his legs while Lord was writing on a white board.

Lord did not report any of these incidents when they occurred, though he did tell Reimer to stop. Lord's first formal complaint about Reimer came on July 30, 2007, when he went to the office on his day off to voice his concerns to Bohlen. Before talking to Bohlen, however, Lord sought out two coworkers who had witnessed Reimer's conduct and recorded statements from each. Lord also encountered Kent, the Executive Producer, but said nothing about Reimer's behavior; he later explained that he was worried about losing his job for being overly concerned about Reimer. Lord reported Reimer's conduct to Bohlen, who forwarded the complaints to Kopecky.

On July 31 Kent issued an unrelated disciplinary "write-up" to Reimer and Lord stemming from a DVD malfunction that occurred during a presentation Kent was giving. Kent thought that both Reimer and Lord were responsible for the technical malfunction, but he was mistaken about Lord's degree of involvement. Lord immediately responded with a heated email to Kent accusing the company of retaliating against him for reporting sexual harassment by a coworker; he also said he was "very close to filing a complaint with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission." After discussing the matter with Lord and investigating the DVD mishap further, Kent promptly withdrew the write-up and apologized for "misunderstanding [Lord's] level of involvement with this issue."

The next day, August 1, High Voltage fired both Reimer and Lord. According to personnel records documenting the reasons for the terminations, Reimer was fired for harassing Lord, and Lord was fired for four reasons: (1) failing to immediately report incidents of harassment to Bohlen as instructed; (2) failing to report incidents of harassment to Kent, again as specifically instructed; (3) obsessively "tracking" the "performance, timeliness, and conduct" of his coworkers; and (4) insubordination. The insubordination charge had to do with Lord's ill-tempered response to Kent's mistaken disciplinary write-up over the DVD malfunction. Bohlen thought it was "inappropriate for [Lord] to threaten the company[] instead of just correcting the mis-information on the write-up."

After losing his job, Lord filed an administrative complaint with the EEOC and received notice of his right to sue.

He then brought this action against High Voltage alleging claims for discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e–2. His discrimination claim was premised on allegations that the company created a hostile work environment. Lord also alleged disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12112, and several state-law claims.[1]

High Voltage moved for summary judgment on all claims. The judge granted the motion, concluding that Lord lacked sufficient evidence to permit any of his claims to go forward. Lord appeals, challenging only the decision on the Title VII claims.

## II. Discussion

We review the district court's order granting summary judgment de novo, construing the evidence and drawing all reasonable inferences in Lord's favor. *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015). Summary judgment is appropriate if the record presents no genuine issues of material fact and High Voltage is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

### A. Discrimination

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This prohibition encompasses the "creation of a hostile work environment" that is severe or pervasive

---

[1] The ADA claims were predicated on his diagnosis and treatment for anxiety and depressive disorders.

enough to affect the terms and conditions of employment. *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013)). A hostile-work-environment claim requires proof of four elements: (1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. *Id.*

Citing the audio-bug joke and Reimer's unwanted physical contact, Lord maintains that the conduct of his male coworkers created a hostile work environment. That claim is a nonstarter because Lord has not established that his coworkers harassed him because of his sex.

Same-sex harassment claims are cognizable under Title VII provided that "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* … because of … sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)) (alteration in original). Of course, that requirement applies to *all* claims of employment-based sexual harassment, whether same sex *or* opposite sex. *Id.* at 80 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (quotation marks omitted). But in opposite-sex harassment cases involving "explicit or implicit proposals of sexual activity," the inference of discrimination is easier to draw because "it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* The same does not hold true for same-sex harassment cases absent some evidence that the harasser

was homosexual. *Id.*; *see also Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1062 (7th Cir. 2003) ("Therefore, in same-sex harassment cases, the central question is whether the harassment occurred 'because of the plaintiff's sex.'").

In *Oncale* the Supreme Court offered two other examples of conduct that might support an inference of discrimination on the basis of sex in the context of a same-sex harassment claim. The first is when a harasser uses "such sex-specific and derogatory terms" as to make it clear that he "is motivated by a general hostility to the presence of [members of the same sex] in the workplace." *Oncale*, 523 U.S. at 80. The second is when the plaintiff offers "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80–81. We've noted in the past that there's no reason to think these examples are exhaustive. *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). "What matters … is not whether the facts … correspond exactly to any of the three examples the Supreme Court has identified, but whether a reasonable factfinder could infer from those facts that [the plaintiff] was harassed 'because of' his sex." *Id.*

Lord argues that the judge went astray in his case by requiring his same-sex harassment claim to "fit neatly" into one of the three scenarios that *Oncale* describes. That argument overlooks a more fundamental shortcoming: There is no evidence from which a trier of fact could infer that he was harassed *because of* his sex. Nothing suggests that Reimer was homosexual, and Reimer's behavior was not so explicit or patently indicative of sexual arousal that a trier of fact could reasonably draw that conclusion. *Cf. id.* at 1009–10. And neither the audio-bug joke nor Reimer's conduct reflect

a general hostility to the presence of men in the workplace: Lord points to no facts suggesting that only male employees at High Voltage were the objects of this sort of teasing.

Instead, Lord relies entirely on the fact that the audio-bug joke and Reimer's conduct had sexual overtones. But the Supreme Court has said that's not enough. *See Oncale*, 523 U.S. at 80 ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."). "Sexual horseplay differs from sex *discrimination*, and Title VII covers only discriminatory conduct." *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005). Absent some evidence of the latter, the former is insufficient to support a Title VII claim. *Id.*; *Orton-Bell*, 759 F.3d at 775; *see also Johnson v. Hondo, Inc.*, 125 F.3d 408, 412–13 (7th Cir. 1997). Because no reasonable jury could conclude that Lord was targeted for harassment because of his sex, summary judgment for High Voltage was appropriate.

## B. Retaliation

Title VII also prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e-3(a); *see also Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000). A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a

causal link between the two. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

Lord contends that High Voltage fired him because he complained to the human-resources department about Reimer's conduct and the audio-bug joke. The judge concluded that Lord's complaints about his coworkers did not amount to protected activity because they did not concern the type of conduct that Title VII prohibits. We agree. We also conclude that Lord has failed to produce evidence of causation.

To the first point, a retaliation claim isn't doomed simply because the complained-of conduct was not in fact an unlawful employment practice; rather, the plaintiff must have "a sincere and *reasonable* belief that he is opposing an unlawful practice." *Hamner*, 224 F.3d at 706–07 (emphasis added). "The objective reasonableness of the [plaintiff's] belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute." *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008). That determination requires us to ask whether the complained-of conduct entailed a motive that Title VII prohibits. *See id.*; *Hamm*, 332 F.3d at 1066; *Spearman v. Ford Motor Corp.*, 231 F.3d 1080, 1086 n.5 (7th Cir. 2000); *Hamner*, 224 F.3d at 707.

As we've already explained, although Lord's complaints concerned workplace banter and conduct that had sexual overtones, no evidence suggests that he was harassed because of his sex. Without evidence of a prohibited motive, Lord's belief that he was complaining about sexual harassment, though perhaps sincere, was objectively unreasonable.

*Hamner*, 224 F.3d at 707–08. Accordingly, Lord's retaliation claim fails for lack of evidence that he engaged in protected activity.

But even if we assume that Lord's complaints about workplace harassment were protected activity, he has not shown that he was fired *because of* those complaints. A retaliation claim requires proof of causation, which in this context means but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). The parties discuss the "direct" and "indirect" evidence of causation and debate whether the record demonstrates a "convincing mosaic" establishing retaliatory discharge, but we have recently jettisoned that approach in favor of a more straight-forward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge? *Ortiz v. Werner Enters., Inc.*, No. 15-2574, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016) ("Th[e] legal standard … is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.").

Lord relies entirely on evidence of suspicious timing. He was fired within two days of his complaint about Reimer's conduct and only one day after telling Kent that he was "close to filing a complaint with the [Illinois Department of Human Resources] and EEOC." Suspicious timing by itself will rarely support an inference of retaliation, but it may do so "[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can

show the person who decided to impose the adverse action knew of the protected conduct." *Culver*, 416 F.3d at 546 (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). The record supports drawing the inference here. Bohlen and Kopecky fired Lord two days after he talked to Bohlen about Reimer. Kopecky was aware of Lord's complaint because Bohlen immediately forwarded it to him.

Our inquiry doesn't end there, however. When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment. *See Culver*, 416 F.3d at 547–48; *see also Argyropoulos v. City of Alton*, 539 F.3d 724, 736 n.6 (7th Cir. 2008); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 643 (7th Cir. 2002); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797–99 (7th Cir. 1997). If High Voltage can make that showing, then the alleged "retaliatory motive, even if unchallenged, was not a but-for cause of [Lord's] harm." *Stone*, 281 F.3d at 643. Of course, an employer's proffered justifications are always susceptible to attack, and Lord can avoid summary judgment if a material factual dispute exists on the question of pretext. *Argyropoulos*, 539 F.3d at 736. "Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe [High Voltage's] explanation." *Culver*, 416 F.3d at 547.

As we've noted, the relevant personnel records list several nonretaliatory reasons for High Voltage's decision to fire Lord. These include his failure to immediately report allegations of harassment to Bohlen and Kent, as they had instructed him to do; his fixation on his coworkers' "performance, timeliness, and conduct"; and insubordination (the

testy email in response to Kent's mistaken disciplinary write-up).

Lord has no evidence that calls these reasons into question. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos*, 539 F.3d at 736 (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). We have repeatedly emphasized that when "assessing a plaintiff's claim that an employer's explanation is pretextual, we do not … second-guess[] an employer's facially legitimate business decisions." *Id.* (internal quotation marks omitted). An employer's reasons for firing an employee can be "foolish or trivial or even baseless,'' as long as they are "honestly believed." *Culver*, 416 F.3d at 547 (quoting *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997)).

Rather than casting doubt on the sincerity of High Voltage's reasons for firing him, Lord merely quibbles with the wisdom of his employer's decision. For example, he challenges Bohlen's determination that he waited too long to notify human resources about Reimer's conduct. He notes that he reported the Reimer incidents just 12 days after they began and only 2 days after the latest one. He does not dispute, however, that Bohlen and Kopecky had instructed him to report any such incidents *immediately* and that he failed to follow these instructions. Likewise Lord questions the company's judgment that it was "inappropriate" for him to respond to the mistaken disciplinary write-up by threatening to file a lawsuit rather than first trying to resolve the misunderstanding. Whether this particular justification was wise or warranted is beside the point. What matters is

whether Bohlen and Kopecky honestly believed it. Lord has no evidence that they did not.

Finally, Lord argues that a reasonable jury could draw an inference of pretext from the company's shifting explanation of its reasons for firing him. "As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Castro*, 786 F.3d at 577. The problem for Lord is that the record doesn't support his contention that High Voltage's explanation has shifted. He makes much of the fact that High Voltage fired him for several different reasons. That's not indicative of pretext. Employment decisions often rest on multiple grounds. *See id.*

Lord also points to minor semantic variations between Bohlen's deposition testimony and the written personnel report documenting the reasons for the decision to fire him. In substance, however, Bohlen's testimony is entirely consistent with the written report: Both indicate that Lord was fired for insubordination and his failure to immediately bring allegations of harassment directly to his manager or human resources. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (emphasizing that the employer's explanation "must actually be shifting and inconsistent to permit an inference of mendacity"); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (holding that there was no evidence of pretext where the employer's proffered reasons for firing the plaintiff were consistent "in substance if not word choice").

In short, the record contains no evidence from which a reasonable jury could infer that High Voltage's reasons for firing Lord were pretextual. So even assuming that Lord's

complaints about workplace harassment were protected activity, he is unable to establish but-for causation. The retaliation claim fails as a matter of law.

AFFIRMED.

ROVNER, *Circuit Judge*, concurring in part, dissenting in part. I concur in the judgment as to the decision affirming the grant of summary judgment on Lord's claim of discrimination under Title VII because I agree that he has failed to meet his burden as to that claim.

I respectfully dissent as to the grant of summary judgment on the retaliation claim. The majority opinion holds that even if an employer discharges an employee for failing to report harassment, that employee cannot allege retaliation if the employer required him to report such instances immediately and he reported it days later. That holding will encourage employers to place unreasonable time and manner restrictions on the reporting of harassment. If an employee fails to adhere to those employer-imposed restrictions, the employer can then terminate that employee for reporting that harassment with no recourse for that employee to Title VII retaliation protections. It places handcuffs on Title VII retaliation claims, with the employers holding the keys.

As the majority recognizes, Lord could survive summary judgment by demonstrating that he engaged in protected employment activity, that he suffered an adverse action, and that the protected activity was the cause of that adverse employment action. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). At all times in such a case, the fundamental question remains: could a reasonable trier of fact infer that Lord would have kept his job if he had not reported the harassment? *Id.*; *Ortiz v. Werner Enterprises, Inc.*, ___ F.3d ___, 2016 WL 4411434, at *3 (7th Cir. Aug. 19, 2016). The difficult link in many cases is the establishment of a causal relation-

ship between the reporting of the harassment and the termination of employment. Here, we have no such obstacle. The defendants have conceded that Lord was terminated because he complained of harassment. Specifically, the defendants assert that Lord was terminated for "insubordination for 'his failure to follow through on the directives given to him in his performance goals report' including the directives to raise his complaints [of harassment] immediately." Defendant-Appellee Brief at 22. Therefore, Lord was terminated based on his report of the harassment to his employer. In a typical case, that would be the end of the analysis. The plaintiff would have presented evidence of a retaliation claim sufficient to survive summary judgment.

But the defendants argue that the termination does not constitute retaliation because Lord failed to comply with the directive to report harassment *immediately* and the failure to do so constituted insubordination. The majority upholds summary judgment on two grounds: first, that Lord's complaints were not about protected activity; and second, that even assuming Lord's complaints about workplace harassment were protected activity, the employer established that Lord was fired for a non-retaliatory reason in that he failed to *immediately* report allegations of harassment to Bohlen and Kent as he was instructed to do.

I.

The latter holding, that an employer could terminate an employee for reporting harassment two days after it occurred rather than immediately, would allow employers to avoid the retaliation protections of Title VII by imposing

restrictive reporting requirements internally. As the majority points out, Lord reported the Reimer incidents just 12 days after they began and two days after the latest incident with Reimer. But Bohlen and Kopecky had instructed him to report any such incidents immediately and he had failed to do so. Therefore, by imposing restrictions on the time and manner that an employee must report allegations of harassment, the employer was able to characterize the report of harassment as a violation of its rules and terminate the employee on that basis. The majority portrays that as a legitimate business decision and a non-retaliatory reason for the firing, but that characterization represents a profound and dangerous step that would severely undermine the protections of Title VII.

The majority's holding is problematic on a number of levels. By allowing an employer to utilize restrictions of the timing and manner of reporting harassment in order to avoid a claim of retaliation, the holding undermines Title VII and fundamentally restricts the ability of an employee to report harassment. The employer in this case required "immediate" reporting, as is clear in its brief to this court in which it states: "Plaintiff rhetorically ponders without any context, 'What is considered timely?' In this matter, the answer is 'immediately.'" Defendant-Appellee Brief at 57. Accordingly, under the employer's policy, if an employee fails to report harassment at the time in which it occurs, delaying even for a day, then the act of reporting that harassment can be a basis for termination that is not redressible under Title VII. Such a rule would have a profound, chilling effect on the reporting of harassment. Although the employer justifies

the provision by stating that Lord had a pattern of delaying reporting and using the claim of harassment at opportune times, the holding is not limited to the facts in this case. It would allow employers to include in every employee hand-book restrictions on the time and manner in which an employee can report harassment, thus providing a "free pass" in any subsequent retaliation claim if the employee fails to report the harassment in accordance with those employer-initiated rules. It will pretermit the protection from retaliation in Title VII.

Such a restrictive timeliness requirement is not present in Title VII, which allows an employee to file a charge within 180 to 300 days after the last incident of harassment. See 42 USC §2000e-5(e)(1). The employer's ad hoc imposition of a restrictive timeliness provision will now preclude Title VII relief for retaliation for all but the most immediate of com-plaints. Moreover, the adverse impact of such a holding will be more pronounced in the context of harassment allegations due to the nature of such discriminatory conduct. Harass-ment in the workplace is often traumatic, embarrassing, off-putting, and/or ambiguous. It is not at all unusual for em-ployees to wait to report incidents for reasons that are too numerous to exhaustively list but are wide-ranging, includ-ing a desire to ignore it and hope it is not repeated, a reluc-tance to rock the boat and risk alienating co-workers or bosses, a fear of adverse consequences that are difficult to prove in court but nonetheless real to the employee, a failure to appreciate the impropriety of the behavior and the right to complain, or just a reaction of denial and a reluctance to face a difficult situation. See, e.g., *Magyar v. Saint Joseph Reg'l*

*Med. Ctr.*, 544 F.3d 766, 768 (7th Cir. 2008) (in discussing why a complaint was not made immediately by a complainant, "[s]he explained that 'I was hoping it was just a one-time occurrence, and I didn't—I didn't really—that was my first real job and I really didn't know what to do. And I had to check to see, you know, like what are the exact standards in the work force. And then I knew once he did that the second time that I had to talk to her because it was not a one-time occurrence.'") Traumatized employees routinely take at least some time to come to terms with the harassment and garner the courage to report it. And employees often face pressure to "get along" and not report complaints. Here, Lord faced such pressure. When Lord was given the performance goal of immediately notifying Chad Kent if any harassment occurred, he was also reminded at that time that the company was a place filled with "creative individuals" and that "humor is a common method of communication within the company." He was told that if someone crossed the line he should tell them to stop and if they continued he should inform Kent immediately. He understood the point of that conversation to be that he needed to learn how to take a joke. When he subsequently went to Kent the day after the first incident with Reimer, Kent told him that he was concerning himself with others too much and that he did not want to hear anything about Reimer. Lord's experience is similar to that faced by countless harassed employees, who are either explicitly cautioned not to report or who encounter implicit pressure to conform to the culture of the workplace which includes tolerance for such behavior. With a policy requiring immediate reporting, those employees who fail to recognize

and report the harassment immediately will face a dilemma —report it nonetheless and possibly face termination with no recourse to Title VII retaliation protections, or not report it at all and possibly face continued harassment. The protection against retaliation for the reporting will have disappeared for those employees a day after the harassment.

In addition, the nature of such violations also renders this type of policy particularly pernicious. In order for harassment to be actionable as a hostile work environment, it must be severe or pervasive. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866 (7th Cir. 2013). The pervasive nature of harassment often becomes apparent only over time, as incidents that appeared to be minor or isolated are repeated or escalate; yet an employee who identifies such a pattern over time, will be fearful of reporting the earlier incidents because the delayed reporting of those incidents will itself be a dischargeable offense. The policy upheld by the majority today as a legitimate, non-retaliatory business decision would effectively eliminate retaliation claims where harassment occurs over a period of time and is not recognized as such with the first instance of harassment. By failing to report that first incident of harassment immediately, the employee would be in violation of the policy and could be fired with impunity for that infraction if the employee later chose to report that pattern of adverse conduct. It provides the employer with an end-run around the Title VII retaliation provision. This result would severely undermine the goal of Title VII to encourage reporting of discrimination and eradicate such conduct from the workplace.

Moreover, such a ruling is unnecessary to protect any legitimate interests of employers. The timing of the employee's complaints of harassment has always been relevant in Title VII litigation in analyzing the appropriateness of the employer's response. The caselaw is clear that an employer faced with allegations that an employee was harassed may assert that the employee failed to timely report the harassment and that the employer responded promptly when informed. See, e.g., *Lambert*, 723 F.3d at 867 ("If the employer has established a set of procedures for reporting complaints about harassment, the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible … ."). The majority's decision, however, would impose a much more grave consequence to the employee's failure to report harassment promptly enough. Instead of considering such timing as relevant in examining the viability of the claim of harassment, the timing of the reporting can now be the basis for rejecting a retaliation claim outright where the employer concededly discharges the employee for reporting the harassment. An employer seeking to limit its liability for retaliation need only ensure that the employees are subjected to time and manner restrictions on their reporting of claims of discrimination. Because such an interpretation is inconsistent with Title VII and subverts the employee's ability to report harassment, we should reject it. *Flowers v. Columbia College Chicago*, 397 F.3d 532, 534 (7th Cir. 2005) ("[i]f a gaffe on a technical issue allowed the employer to show the worker the door, the anti-retaliation provision would be diluted to the point of use-

lessness.") Lord should be allowed to proceed on the retaliation claim.

## II.

The alternative basis for rejecting the retaliation claim is also problematic. The majority opinion holds that Lord's complaints about his co-workers did not amount to protected activity because they did not concern the type of conduct that Title VII prohibits. The majority states that:

> although Lord's complaints concerned workplace banter and conduct that had sexual overtones, no evidence suggests that he was harassed because of his sex … [and] [w]ithout evidence of a prohibited motive, Lord's belief that he was complaining about sexual harassment, though perhaps sincere, was objectively unreasonable. *Hamner*, 224 F.3d at 707-08.

Majority Op. at 9-10. Although the majority relies on *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707-08 (7th Cir. 2000), that decision does not command the majority's conclusion. We recognized in *Hamner* that, although an employee must possess a subjective belief that he opposed an unlawful employment practice and that belief must be objectively reasonable, that employee may succeed on a retaliation claim even if the challenged practice does not actually violate Title VII, as where the degree of discrimination did not rise to the level in which it affected the terms and conditions of employment. *Id.* at 706-07. Objective reasonableness means only that the complaint must involve dis-

crimination that is prohibited by Title VII. *Id.* at 707; *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008)("[t]he objective reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute.") Hamner claimed discrimination based on his homosexuality, but because sexual orientation is not yet a classification protected under Title VII, his sincere belief that he opposed an unlawful practice could not be objectively reasonable. *Hamner*, 224 F.3d at 707. Lord faces no such legal obstacle to his claim. There is no allegation that the harassment in this case was based on Lord's sexual orientation at all, and no allegation that he was targeted because he was homosexual, heterosexual or bisexual. The allegations here allow the inference that Lord was subjected to unwanted grabbing because Reimer was attracted to him as a man or that the harasser believed that such touching would be particularly discomfiting to him as a male and would not have been pursued if he were female, not that the actions were based on Lord's own sexual orientation. That stands in contrast to the allegations in *Hamner*, in which Hamner alleged discrimination against him because he is gay and based on the harasser's "homophobia."

We held in *Hamner* that the allegations "must concern 'the type of activity that, under some circumstances, supports a charge of sexual harassment.'" *Id.* at 707, quoting *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989). That is all that is needed to satisfy the objective reasonableness component. In cases in which that compo-

nent has been lacking, such as *Hamner*, the allegations themselves precluded coverage under Title VII, whether because the claim was frivolous in that the allegations did not even suggest discrimination, the allegations were defamatory or malicious, or, as discussed, the allegations regarded a category such as sexual orientation that is not yet protected under Title VII. See, e.g. *Hatmaker v. Memorial Med. Ctr*, 619 F.3d 741, 746 (7th Cir. 2010) ("[n]one of the statements that Hatmaker [the plaintiff] made to the investigator ... such as a complaint about Stafford's reference to his divorces or to the fact that his boss let him use the boss's bathroom, was suggestive of sex discrimination"); *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 892 (7th Cir. 2004) (allegations made in bad faith motivated by an expressed desire to get Cone fired, and alleging only that one of Cone's breasts touched his arm during a conversation and one instance in which Cone reached around the plaintiff to get a clipboard but did not touch him, held to be objectively and subjectively unreasonable).

The "type of activity" opposed here is well-established as a type of activity which supports a charge of sexual harassment. Lord alleged the following incidents:

> – On July 18, 2007, Reimer poked Lord in the buttocks as he was walking by Lord who was putting coins in a vending machine; Lord told Reimer that it "was extremely gay" and told him not to do it again, and Reimer retorted that Lord "liked it;"

> – On July 23, 2007, Reimer walked by Lord, made a comment about bending over, and then

slapped Lord's right buttock as he was passing him; a female co-worker who was present at the time looked surprised; Lord stated "What the hell, Nick?;" Lord chastised Reimer who responded by laughing and telling Lord that Lord liked it;

– Two days later, Reimer walked up behind Lord and slapped Lord's buttocks very hard; Lord again chastised Reimer but Reimer laughed it off;

– On July 27, 2007, while Lord was writing on a white board, Reimer grabbed Lord in between his legs and buttocks, leaving Lord shocked and angry; Lord again told Reimer to stop and asked what he would do if a co-worker complained of his conduct to Human Resources; Reimer replied that he would kill that person.

It is well-established that "unwanted physical conduct falls on the more severe side for purposes of sexual harassment." *Magyar*, 544 F.3d at 771. In evaluating the severity of harassment:

'[o]n one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers ... .'

*Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006), quoting *Baskerville v. Culligan Intl. Co.*, 50 F.3d 428, 430 (7th Cir. 1995); *Magyar*, 544 F.3d at 772.

Thus, the type of conduct alleged here falls well within the range of conduct prohibited under Title VII, and in fact is on the more serious side of the spectrum. That the harasser was male rather than female does not remove the harassment from "the type of activity that, under some circumstances, supports a charge of sexual harassment." The Supreme Court, in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998), explicitly held that same-sex harassment claims are not excluded from the coverage of Title VII. As the majority notes, the *Oncale* Court recognized multiple ways in which same-sex harassment could be actionable, such as: where the plaintiff could demonstrate that the harasser was homosexual and therefore it would be reasonable to assume the implicit proposals of sexual activity would not be made to someone of the other sex; where the harasser was motivated by general hostility to persons of the plaintiff's gender in the workplace; or where the harasser treated members of both sexes differently in the workplace. As the Court noted, "'[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale*, 523 U.S. at 80, quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993)(Ginsburg, J., concurring). Therefore, the unwanted sexual contact by a person of the same gender is the type of activity that, under some circumstances, may support a Title VII claim. In fact, the *Oncale* Court acknowledged that con-

duct such as occurred here could constitute harassment in an office environment, noting that "[a] professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." *Id.* at 81.

Nor is protection lost merely because an employee does not succeed on the merits of his charge or because he fails to draft a complaint that states an effective legal claim. *Mattson*, 359 F.3d at 892; *Fine v. Ryan Intl. Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). It is, as we said, a "low bar" for receiving Title VII protection, and properly so. *Mattson*, 359 F.3d at 892. We have stated the standard numerous times, which is that "[i]t is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is 'completely groundless.'" *Fine*, 305 F.3d at 752, quoting *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996); *Mattson*, 359 F.3d at 891 ("the claims must not be utterly baseless"); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)(claims must not be utterly baseless). "[A] groundless claim is one resting on facts that no reasonable person possibly could have construed as a case of discrimination." *Fine*, 305 F.3d at 752. As we recognized in *Fine*, it is not unusual for a plaintiff to make claims that appear legitimate on the surface, but which, after discovery and a fuller inquiry, ultimately turn out to lack merit. *Id.* Title VII precludes retaliation against a plaintiff for making such a "grounded yet unsuccessful, complaint." *Id.* The question, then, is whether we can conclude as a matter of law that Lord had no grounds for believ-

ing that the actions violated Title VII. *Id.*

The allegations by Lord easily surmount that low bar. In asserting that Lord's belief that he was complaining about sexual harassment was objectively unreasonable, the majority pointed to the absence of evidence of a prohibited motive. Yet that veers into litigating the viability of his harassment claim, rather than his retaliation claim. Lord alleges unwanted touching, that was repeated, that was sexual in nature, accompanied by sexually-charged comments. The actions and comments themselves raise the possibility that the conduct was motivated by sexual attraction based on his gender, and that is all that is needed.

In *Fine,* we cautioned in particular against confusing the merits of the harassment claim with the merits of the retaliation claim. We rejected the contention that a plaintiff must produce legally admissible objective evidence that he suffered unlawful discrimination to prevail. *Fine*, 305 F.3d at 752-53. Such a standard "would require every retaliation trial to include a mini-trial on the underlying discrimination, a standard … our circuit rejects." *Id.* at 753. The inquiry into whether Lord can establish a prohibited motive for the harassing conduct would enmesh us into such a mini-trial—particularly in cases in which same sex harassment is alleged. It bears repeating that the allegations are protected activity if they concern "'the type of activity that, under some circumstances, supports a charge of sexual harassment.'" *Hamner*, 224 F.3d at 707, quoting *Holland*, 883 F.2d at 1315. *Oncale* tells us that it is. Rather than hold that under some circum-stances—such as the ones identified in

*Oncale*—Lord could prove that the conduct was sexual harassment, the majority opinion rejects the claim because he has failed to provide evidence of those circumstances. Lord does not need to establish that he will succeed in that harassment action. Absent evidence that would establish a motive that takes the action out of Title VII's protections, such as a motivation based on the plaintiff's sexual orientation as in *Hamner*, there is no basis to determine that the repeated unwanted grabbing of intimate areas of the male body cannot fall within the protections of Title VII. Lord had to demonstrate only that his belief that he was complaining about unlawful discrimination was not "completely groundless." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 674 (7th Cir. 2011). For our court to hold that a person subjected to such conduct is completely groundless in believing that it constitutes sexual harassment would create an extra ordinary burden. We should reject the imposition of that higher bar, not only because of the corresponding mini-trials that will accompany it, but because it will fundamentally undermine the Title VII protections against retaliation.

The two holdings in this appeal are even more troubling in conjunction with each other. By imposing the requirement that an employee present evidence of the motivation of the harasser in order to proceed with a retaliation claim, but upholding that the failure to complain immediately may be grounds for termination, the court eviscerates the protection against retaliation in Title VII. The employee must report harassment immediately in order to retain the protection against retaliatory termination, but if the employee reports harassing conduct without first obtaining evidence of the

harasser's motivation—evidence that will often be difficult to obtain—then the protection against retaliation is lost nonetheless because the complaint will not be held to constitute protected activity. Those competing requirements will swallow the protection against retaliation for countless plaintiffs.

For the above reasons, I respectfully dissent from the portion of the decision affirming the grant of summary judgment as to the claim of retaliation, and concur in the judgment affirming the grant of summary judgment as to the discrimination claim.